| THE TOURO BOULIGNY | * | NO. 2023-C-0583 |
| ASSOCIATION & RELLA | | |
| ZAPLETAL, INDIVIDUALLY, | * | |
| AND IN HER OFFICIAL | | COURT OF APPEAL |
| CAPACITY AS PRESIDENT | * | |
| OF THE TOURO BOULIGNY | | FOURTH CIRCUIT |
| ASSOCIATION | * | |
| | | STATE OF LOUISIANA |
| VERSUS | * * * * * * * | |
| | | |
| ORLEANS PARISH SCHOOL | | |
| BOARD & DR. AVIS | | |
| WILLIAMS, IN HER | | |
| CAPACITY AS | | |
| SUPERINTENDENT OF | | |
| ORLEANS PARISH SCHOOL | | |
| BOARD | | |

APPLICATION FOR WRITS DIRECTED TO
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-04914, DIVISION "L"
Honorable Kern A. Reese, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Sandra Cabrina Jenkins, Judge Dale N. Atkins)


Michael R. Dobson
FISHMAN HAYGOOD L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, LA 70170-4600

     COUNSEL FOR RELATORS


Stephen Gele
Smith & Fawer, L.L.C.
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170

     COUNSEL FOR RESPONDENTS

                        **WRIT GRANTED;**
                        **RELIEF DENIED**
                        **October 11, 2023**

This is a suit by a neighborhood association—the Touro Bouligny Association and Rella Zapletal, in her individual capacity and in her official capacity as the Touro Bouligny Association's President (collectively the "Association")—seeking injunctive, declaratory, and mandamus relief.[1] The Association filed this suit against the Orleans Parish School Board ("OPSB").[2] From the trial court's August 7, 2023 judgment denying its summary judgment motion, OPSB filed this writ application seeking supervisory review. For the following reasons, we grant OPSB's writ, but deny relief.[3]

---

[1] The petition also includes a prayer for damages and attorney's fees.

[2] The Association also named Dr. Avis Williams, in her capacity as Superintendent of Orleans Parish School Board ("Dr. Williams"), as a defendant. For ease of discussion, we refer to the defendants—OPSB and Dr. Williams—singularly as the OPSB.

[3] As mandated by La. C.C.P. art. 966(H), we provided the parties an opportunity to request oral argument and considered OPSB's request for oral argument. But, after careful consideration, we found oral argument unnecessary under the facts of this case and elected to exercise our discretion to decide this writ on the written briefs.

**I.**

A trial court's ruling on a summary judgment motion is reviewed using a *de novo* standard. *Planchard v. New Hotel Monteleone, LLC*, 21-00347, p. 2 (La. 12/10/21), 332 So.3d 623, 625 (citations omitted). An appellate court uses the same standards and rules as a trial court in deciding whether summary judgment is appropriate—"whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Planchard*, 21-00347, pp. 2-3, 332 So.3d at 625.

A summary judgment motion "shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3).[4] A genuine issue of fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on the issue, and the granting of summary judgment is appropriate. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (citation omitted). A material fact is one that "might affect the outcome of the suit." *Id.* Whether a fact is material must be determined based on the applicable substantive law. *Roadrunner Transp. Sys. v. Brown*, 17-0040, p. 7 (La. App. 4 Cir. 5/10/17), 219 So.3d 1265, 1270 (citation omitted).

---

[4] The Louisiana Legislature amended La. C.C.P. art. 966, effective August 1, 2023. The amendment to this article, however, is not applicable to this appeal.

## II.

The Association's principal claim is for injunctive relief—an injunction blocking a proposed property swap between OPSB and the Housing Authority of New Orleans ("HANO"). OPSB plans to swap three of its now-vacant school properties. In exchange for its trio of properties, OPSB is to receive from HANO a vacant property that adjoins the Booker T. Washington High School (the "BW Cooper Property").

The Association's primary objection to the land swap is its desire to maintain the status of one of the trio of properties OPSB plans to swap—the McDonough No. 7 property (the "McDonogh Property")—as a school.[5] The other two properties the OPSB plans to swap are the Derham and Chester properties.[6] According to the Association, the McDonogh Property appraised for $4,540,000 in August 2022; the Derham property appraised for $495,000 in December 2018; and the Chester property appraised for $375,000 in December 2014. Together, the trio of OPSB properties appraised for $5,410,000. In contrast, HANO's BW Cooper

---

[5] The McDonogh Property is a historic school building constructed in 1877. When the Association's petition was filed, the McDonogh Property was leased and occupied by the Audubon Charter School ("Audubon"). Thereafter, at the end of the 2020-21 school year, Audubon vacated the property. At the time of the summary judgment hearing, the McDonogh Property was vacant.

[6] A fourth property was mentioned in connection with the proposed land swap—the Jordan property. The record is unclear as to status of the Jordan property is relation to the proposed property swap.

Property appraised in August 2021 for $3,225,000.[7] The gap in appraised value between the exchanged properties is in excess of two million dollars.[8]

The gap in appraised value of the properties is the basis for the Association's claim that the proposed property swap violates the constitutional prohibition against donating public property contained in La. Const. art. VII, § 14(A).[9] According to the Association, the values of the properties proposed to be swapped must be substantially similar to avoid running afoul of the constitutional prohibition. The Association argued that the proposed exchange by OPSB of the McDonogh Property and two other properties for the BW Cooper Property—an environmentally contaminated, valueless, vacant lot—constitutes a constitutionally prohibited donation.

Conversely, OPSB contended that the proposed property swap was constitutionally valid. In support, OPSB contended that La. Const. art. VII, § 14 itself includes several exceptions.[10] OPSB further contended that the "value" to the

_____

[7] In its original petition, the Association alleged that in 2018 the BW Cooper Property was appraised for $2.8 million dollars, while the McDonogh Property was appraised at $3.55 million dollars.

[8] The McDonogh Property is a historic school building—constructed in 1877. When the petition was filed, the McDonogh Property was leased and occupied by the Audubon Charter School ("Audubon"). Audubon vacated the Property at the end of the 2020-21 school year.

[9] La. Const. art. VII, § 14(A) provides:

> Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.

[10] One exception is for "social welfare" expenditure set forth in La. Const., art. VII, § 14(B), which specifically authorizes the use of public funds for programs of social welfare. OPSB cites to an Attorney General opinion as an example of recreation space for children being a "social welfare" expenditure authorized by the Louisiana Constitution. But, the Attorney General's opinion does not relate to a school board's transfer of property. Instead, it was in response to a

OPSB to satisfy the requirements of the Louisiana Constitution can—and, here, was agreed to—come from multiple sources other than the appraised values of the underlying properties and that the agreed-upon consideration for the exchange is indisputably sufficient. The gap in appraised values, according to OPSB, was met by the remediation costs expended—or to be expended—by HANO, the intangible value it was to receive, or both. In support of its position, OPSB cited the affidavit of Tiffany Delour, OPSB's Chief Operations Officer, who attested as follows:

- Currently, students enrolled at Booker T. Washington High School must walk or otherwise travel several blocks to access the high school's currently available athletics facilities. The OPSB will receive significant value from having athletic facilities for the high school adjacent, and easily accessible, to Booker T. Washington. The OPSB will also receive significant value from the additional parking and storm water management that could be installed on the BW Cooper property as well as the aesthetic and other intangible value from having the otherwise-vacant and undeveloped BW Cooper property developed for school purposes.

- The current owner of the BW Cooper property, [HANO], has agreed since 2018 to perform environmental remediation and associated work on the BW Cooper property for purposes of preparing the BW Cooper property for the OPSB's intended use (i.e., to remediate the property to educational, rather than [United States Department of Housing and Urban Development ("HUD")], standards). As communicated to the OPSB by HANO in 2018, the value of the remediation work agreed by HANO to be performed for the benefit of the OPSB's intended use exceeds $4 million.

---

request from the City of Iberia "regarding the use of public funds to assist the children that participate in the little league baseball program" that was operating in the city. La. Att'y Gen. Op. No. 02-0128 (May 29, 2002). Furthermore, with regard to exchanges of school properties, several Attorney General opinions have observed that when transferring surplus school property, Louisiana law requires that the property is appraised and that fair market value is received pursuant to La. Const., art. VII, § 14. *See* La. Op. Att'y Gen. No. 14-0005 (Apr. 30, 2014) (observing that "to comply with this particular constitutional provision, the City and Parish must ensure that the value of the exchange is equivalent on both sides. In other words, one entity cannot receive a piece of property that is worth less than the property it is giving up in the exchange").

Rejecting OPSB's argument, the trial court denied its summary judgment motion. Although the Association pled and argued other procedural and statutory grounds in support of its request for injunctive relief, the trial court denied the motion based only on the alleged violation of the constitutional prohibition against donating public property. The trial court, in its oral reasons for judgment, observed that "whether the values are equivalent is the last hurdle that [OPSB] ha[s]n't cleared at this point."[11] From that ruling, OPSB filed this writ.

## III.

The narrow issue presented by this writ is whether OPSB's proposed property swap violates the constitutional prohibition against donating state property set forth in La. Const., art. VII, § 14(A). Construing this constitutional prohibition, the Louisiana Supreme Court has observed that it is "violated when

_____

[11] This Court has observed that "[a] trial court's reasons for judgment are not part of the judgment and that appellate courts review judgments, not reasons for judgment . . . [b]ut, appellate courts may consider a trial court's reasons for judgment to obtain insight into the trial court's judgment." *Heard, McElroy & Vestal, L.L.C. v. Schmidt,* 22-0221, p. 16 (La. App. 4 Cir. 9/21/22), 349 So. 3d 663, 673 (citations omitted)). Here, the trial court, in denying OPSB's summary judgment motion, provided the following oral reasons for judgment:

> In a perfect world, the remediation would be complete, another appraisal would be undertaken, you would have a definitive value. You match that up for the McDonogh 7 property, the Derham property, and I'm forgetting the other one, regardless, and see how they match up. If they match up at that point, then maybe you have a point. If they don't, then y'all have to work something else out.
>
> * * *
>
> What I am saying is that there is a genuine issue of material fact as to what the value of the HANO lot is at this juncture.
>
> * * *
>
> And there's no way to consider the equivalency of the values at this point because it's [ephemeral]. Once it's definitive, that's a different story. . . . But right now, you know, I think that there is that genuine issue of material fact that needs to be resolved, and it's not.

6

public funds or property are gratuitously alienated." *Bd. of Directors of Indus. Dev.*

*Bd. of City of Gonzales, Louisiana, Inc. v. All Taxpayers*, *Prop. Owners, Citizens*

*of City of Gonzales*, 05-2298, p. 20 (La. 9/6/06); 938 So.2d 11, 23 ("*Cabela's*"). As

a commentator has observed, the *Cabela's* case is the source of the following

three-prong test for determining whether a particular transaction violates the

constitutional prohibition set forth in La. Const., art. VII, § 14(A):

1. There must be a public purpose for the transfer which comports with the governmental purpose for which the public entity has legal authority to pursue;

2. The transfer, taken as a whole, does not appear to be gratuitous (there should be real reciprocal obligations between the parties to the transfer); and

3. The public entity has a demonstrable, objective, and reasonable expectation of receiving at least equivalent value in exchange for the transfer.

Isabel Englehart, *The Levee Disservitude: How and Why Louisiana Should Stop*

*Undermining One of Its Most Essential Powers*, 83 La. L.Rev. 841, 870-71 (2023)

(reformatted) ("*Englehart*").[12]

"Attorney General opinions, as opposed to jurisprudence, have dominated

the guidance on what constitutes an unconstitutional state donation." *Englehart*; 83

La. L.Rev. at 870. In a plethora of opinions, the Attorney General's Office has

applied the three-prong *Cabela's* test to determine the validity of proposed

transfers of public property. In so doing, the Attorney General's Office routinely

has observed that the third prong of the *Cabela's* test presents a fact questions.

---

[12] The Attorney General is authorized by statute to challenge contracts that violate La. Const., art. VII, § 14. *See* La. R.S. 38:2193.

Such is the case here. Indeed, in denying OPSB's summary judgment motion, the trial court implicitly found a genuine issue of material fact as to the third prong of the *Cabela's* test—whether HANO's BW Cooper Property is equivalent in value to the trio of OPSB's properties being swapped.[13]

In its writ, OPSB argues that the trial court erred by focusing solely on the post-remediation fair market value of HANO's BW Cooper Property to find that a genuine issue of material fact exists. The gist of OPSB's argument is that the two million dollar gap between the appraised value of the trio of OPSB's properties and HANO's BW Cooper Property is filled by one or both of the following two factors: (i) the remediation cost that HANO has expended—or has agreed to expend—on the BW Cooper Property; and (ii) the intangible value to OPSB of receiving the BW Cooper Property. We separately address each factor.

*HANO's Remediation Work*

OPSB contends that even if cash consideration is the sole focus of the equivalent value issue, the proposed property swap is supported by millions of dollars in remediation costs expended—or to be expended—by HANO. OPSB represents that since 2018, HANO has agreed to perform in excess of four million dollars in remediation work to prepare the BW Cooper Property for use by the OPSB. But, the record contains correspondence, dated October 2018, from HANO's Executive Director, Greg Fortner, directed to the OPSB's former Chief Operating Officer, Eric Seling, stating that "HANO has prepared the site for

---

[13] Here, the dispute is over the third prong of the *Cabela's* test. We, thus, find it unnecessary to address the first and second prongs.

redevelopment by completing over $4 million in environmental remediation." The record also contains correspondence, dated September 2019, from HANO directed to HUD, requesting disposition of the BW Cooper Property, in which HANO states that it is "anticipate[d] [that] the difference in appraisal value between the HANO and OPSB properties will be mitigated by extensive soil remediation efforts that have been conducted on the HANO site." Ms. Delour attests in her affidavit, quoted elsewhere in this opinion, that "[a]s communicated to the OPSB by HANO in 2018, the value of the remediation work agreed by HANO to be performed for the benefit of the OPSB's intended use exceeds $4 million." Given these statements, we find, as the Association contends, the record is unclear whether the four million dollars in remediation costs that HANO has already expended represents that entity's total agreed upon remediation costs or whether HANO has agreed to expend additional remediation costs. It is also unclear whether OPSB will be required to expend additional remediation costs to make the property suitable for school use.

Although there is no requirement that HANO complete the required remediation work before a determination as to the current value of HANO's BW Cooper Property can be ascertained, at this juncture, the current value of that property cannot be ascertained on this record. For this reason, OPSB's reliance on the remediation costs to establish the equivalence of values proposed to be exchanged in the swap is misplaced.

*Intangible Value*

The other factor OPSB cites is the intangible value associated with it receiving the BW Cooper Property. According to OPSB, the intangible value supports a finding of sufficient, equivalent consideration. In support, OPSB cites *Bd. of Assessors of City of New Orleans v. City of New Orleans*, 02-0691, p. 16 (La. App. 4 Cir. 9/25/02), 829 So.2d 501, 509, as standing for the proposition that intangible value is an important factor in deciding whether there has been an unconstitutional donation of public property.

In the *Bd. of Assessors* case, the challenged transaction included multiple parts: "the PILOT Agreement between the developers and the City, the related HUD loan to the City, and the development bonds issued by [the industrial development boards] and purchased by individual investors." 02-0691, p. 15, 829 So.2d at 509. Finding the multi-part transaction did not constitute a constitutionally invalid donation, this Court observed that "[c]onsideration clearly flows through the transaction," including that "the City is able to have an economically disadvantaged area developed" and that "the citizens receive the benefit of economic development that would not have taken place absent the PILOT and HUD loan." *Id.* Continuing, this Court observed that "[a] public entity has wide discretion to contract, provided it receives sufficient consideration, which may include economic return, increased employment and attraction of similar development to the area." *Id.* (citation omitted).

Here, unlike in the *Bd. of Assessors* case, it cannot be concluded, on this record, that consideration clearly flows through the proposed property swap. The intangible value to OPSB of receiving HANO's BW Cooper Property hinges on the ability to develop that property as planned—for school use. But, the record reflects that the plan to do so is uncertain for multiple reasons. First, whether the swap will have a negative effect on OPSB given the two million dollar gap in appraised values of the properties being exchanged is unclear. Second, there is uncertainty, given the lack of information, as to the cost of the remaining remediation work that must be completed before the BW Cooper Property can be developed for school use. Finally, as discussed elsewhere in this opinion, there is uncertainty as to whether HANO, OPSB, or both will have to bear any required remaining remediation costs. OPSB's reliance on the intangible value flowing from the swap to establish equivalence in value exchanged is thus misplaced.

Accordingly, the trial court did not err in denying OPSB's summary judgment motion given that whether the values of the properties proposed to be swapped are equivalent cannot be ascertained.

## DECREE

For the foregoing reasons, OPSB's writ is granted, but the relief requested is denied.

**WRIT GRANTED; RELIEF DENIED**